# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

STATE OF WEST VIRGINIA ex rel.
DARRELL V. MCGRAW, JR., ATTORNEY GENERAL,

        Plaintiff,

v.                                  CIVIL  ACTION  NO.  3:11-0683

JPMORGAN CHASE & CO.
and CHASE BANK USA, N.A.,

        Defendants.

STATE OF WEST VIRGINIA ex rel.
DARRELL V. MCGRAW, JR., ATTORNEY GENERAL,

        Plaintiff,

v.                                  CIVIL  ACTION  NO.  3:11-0688

DISCOVER FINANCIAL SERVICES, INC.,
DISCOVERY BANK,
DFS SERVICES, L.L.C. and
ASSURANT, INC.,

        Defendants.

STATE OF WEST VIRGINIA ex rel.
DARRELL V. MCGRAW, JR., ATTORNEY GENERAL,

        Plaintiff,

v.                                  CIVIL  ACTION  NO.  3:11-0689

GE MONEY BANK,

        Defendant.

STATE OF WEST VIRGINIA ex rel.
DARRELL V. MCGRAW, JR., ATTORNEY GENERAL,

Plaintiff,

v.                                    CIVIL  ACTION  NO.  3:11-0690

WORLD FINANCIAL NETWORK
NATIONAL BANK, CSI PROCESSING, LLC
and CPP NORTH AMERICA, LLC,

Defendants.

STATE OF WEST VIRGINIA ex rel.
DARRELL V. MCGRAW, JR., ATTORNEY GENERAL,

Plaintiff,

v.                                    CIVIL  ACTION  NO.  3:11-0691

FIRST PREMIER BANK
FIRST PREMIER BANKCARD and
UNITED NATIONAL CORPORATION,

Defendants.

STATE OF WEST VIRGINIA ex rel.
DARRELL V. MCGRAW, JR., ATTORNEY GENERAL,

Plaintiff,

v.                                    CIVIL  ACTION  NO.  3:11-0693

BANK OF AMERICA CORPORATION and
FIA CARD SERVICES, N.A.,

Defendants.

STATE OF WEST VIRGINIA ex rel.
DARRELL V. MCGRAW, JR., ATTORNEY GENERAL,

Plaintiff,

v.                                    CIVIL  ACTION  NO.  3:11-0695

CITIGROUP, INC and
CITIBANK, N.A.,

Defendants.

STATE OF WEST VIRGINIA ex rel.
DARRELL V. MCGRAW, JR., ATTORNEY GENERAL,

Plaintiff,

v.                                                    CIVIL  ACTION  NO.  3:11-0717

HSBC BANK NEVADA, N.A. AND
HSBC CARD SERVICES, INC.,

Defendants.

## MEMORANDUM OPINION AND ORDER

Pending is Plaintiff's Motion to Remand and for Costs and Fees (ECF No. 14).  For the reasons given below, the motion is **GRANTED** as to remand and **DENIED** as to costs and fees.

### I.  Background

In August 2011, the State of West Virginia, through its Attorney General, Darrell V. McGraw, Jr., brought suit in the Circuit Court of Mason County, West Virginia, against eight credit card issuers.  Complaint, ECF No. 1,[1] Ex.1 (Civil Action No. 11-C-94-N, Filed Aug. 16, 2011).  The actions challenge Defendants' practices in selling and administering "payment protection plans," ancillary services attached to consumer credit card accounts.  *Id*.  The Defendants are: JP Morgan Chase & Co. and Chase Bank USA, N.A., 3:11-683, a nationally-chartered banking association; Discover Bank, 3:11-688, a state-chartered bank; GE Money Bank, 3:11-689, a federally-chartered

---

[1] Electronic case file numbers listed in this opinion correspond to the docket in 3:11-cv-683 (State of West Virginia v. JP Morgan Chase & Co. and Chase Bank USA, N.A.), the first-filed of the related actions.  Such file numbers refer to documents filed in all eight cases.

savings association; World Financial Network Bank, 3:11-690, previously a nationally-chartered bank, but now a state-chartered bank; First Premier Bank, 3:11-691, a state-chartered bank; Bank of America Corp. and FIA Card Services, N.A., 3:11-693, a nationally-chartered banking association; Citigroup, Inc., and Citibank, N.A., 3:11-695, a nationally-chartered banking association; and HSBC Bank Nev., 3:11-717, a nationally-chartered banking association. The Complaint is largely identical as all Defendants, and, although the cases are not formally consolidated, Defendants agreed to a coordinated briefing process. *See* ECF No. 13.

Plaintiff's Complaint alleges several violations of the West Virginia Consumer Credit and Protection Act ("WVCCPA"), specifically: 1) unfair or deceptive acts or practices; 2) unconscionable conduct; and 3) collection of excess charges. Complaint, ECF No. 1, Ex. 1. All eight Defendants removed the actions to this Court (Defs.' Notice of Removal ("NOR"), ECF No. 1), and Plaintiff moved to remand (Pl.'s Mot. to Remand, ECF No. 14). Defendants oppose remand, arguing that removal to this court is justified for three reasons. First, the Complaint challenges the "rate of interest" charged to credit card accounts, and is therefore completely preempted by the National Bank Act under *Beneficial National Bank v. Anderson*, 539 U.S. 1 (2003). Second, the Complaint is actually a disguised class or mass action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), and may be removed on that basis. Third, some of the Defendants argue that the Complaint presents a substantial federal question, and is therefore removable under the rule of *Grable & Sons Metal Prods., Inc., v. Darue Eng. & Mfg.*, 545 U.S. 308 (2005). In evaluating these arguments, the Court is mindful "that federal courts are courts of limited jurisdiction, that [we] should construe removal statutes narrowly, and that any doubts should be resolved in favor of state court jurisdiction." *Barbour v. Int'l Union*, 640 F.3d 599, 617 (4th Cir. 2011) (en banc).

The Complaint focuses on "payment protection plans" and related products, sometimes called "Debt Cancellation Contracts" (DCC) or "Debt Suspension Agreements" (DSA).[2] These products allow credit card holders to suspend due minimum payments, or cancel debt entirely, when a "qualifying" event occurs, usually a life event interrupting employment, such as job loss, illness, deployment, or marriage. Cardholders pay a monthly fee for this service, which is charged directly to the enrolled credit card account. The fee is generally a percentage of the enrolled account's monthly balance. Cardholders sign up for these products in a process separate from initially opening the credit card account. The Comptroller of Currency (OCC) regulates these plans when offered by national banks. *See* 12 C.F.R. § 37.1 *et seq*.

The Complaint attacks Defendants' sale and administration of DCC and DSA on several grounds. First, Plaintiff alleges that the plans have little-to-no value to many of the consumers who pay for them. Complaint, ECF No. 1, Ex. 1, at ¶¶ 43-45. Further, when a consumer does experience a qualifying event, it is prohibitively difficult to claim any benefit from the plans. *Id*. at ¶ 61. Next, Plaintiff challenges Defendants' methods of enrolling and retaining cardholders as plan customers. Defendants allegedly enroll consumers without informed consent—for example, asking a consumer if he or she would like to see a packet of paperwork on the plan, then taking acceptance of the packet as an acceptance of the plan. *Id*. at ¶¶ 24-25. Plaintiff also alleges that Defendants knowingly enroll consumers who could never receive benefits under the plan, such as disabled or retired persons, whose fixed income is not subject to the qualifying events that trigger coverage under the plan. *Id*.

---

[2] *See, e.g.*, 12 C.F.R §§ 37.2(f)–(g) (defining Debt Cancellation Contracts and Debt Suspension Agreements ).

at ¶¶ 46-55.  Plaintiff last alleges that it is prohibitively difficult to cancel a subscription to the plan. *Id*. at ¶ 62.

## II.  Complete Preemption

Defendants first ground their removal argument in the doctrine of complete preemption, arguing that the Complaint's attacks on DCC/DSA challenge the "rate of interest" charged to the enrolled credit card account.  Under the National Bank Act (NBA), any challenge to the "rate of interest" is completely preempted by federal law.  12 U.S.C. § 85.  Resolution of this issue requires a detailed examination of the specifics of the Complaint, of the doctrine of complete preemption, and of the definition of the "rate of interest" under the NBA.

Plaintiff's Complaint asserts misconduct in the sale and administration of various financial service products, but focuses, as do Defendants' arguments for removal, on payment protection plans (DCC/DSA).  The Complaint defines the plans as "ancillary services," which protect consumers from fraud and unauthorized charges and increase financial security.  Complaint, ECF No. 1, Ex. 1, at ¶¶ 19-20.  The plans allow a cardholder to cancel monthly minimum payments, or defer them for a limited period, thus preventing delinquencies.  *Id*. at ¶¶ 42-43.  When the payment deferment or cancellation benefit is invoked, both monthly interest and the DCC/DSA fee continue to accrue. *Id*. at ¶ 47.  Defendants offer no evidence to support a contrary characterization of the DCC/DSA at issue, nor do they offer any affirmative evidence that they treat the plans as "interest" in their own business practices.  In the absence of such evidence the Court relies on Plaintiff's undisputed characterization of the substance and function of the plans at issue.

This Court's removal jurisdiction is limited.  A civil action is removable if the plaintiff's claim is one "arising under" federal law.  28 U.S.C. § 1441(b).  "[A] suit arises under [federal law] . . . when the plaintiff's statement of his own cause of action shows that it is based upon those laws or [the] Constitution.  It is not enough that the plaintiff alleges some anticipated defense to his [state] cause of action and asserts that the defense is invalidated by some provision of [federal law]." *Louisville & Nashville R. Co. v. Mottley*, 211 U.S**.** 149, 152 (1908).  In this case, Plaintiff's Complaint states only claims under the WVCCPA, a state law, and mentions no federal cause of action.  "As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003)*.*

However, certain exceptions to this "well pleaded complaint" rule do exist.  For instance, "[w]hen [a] federal statute completely pre-empts [a] state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law." *Id.* at 8.  Under the "complete preemption" doctrine, such a case is removable pursuant to 28 U.S.C. § 1441(b).  Complete preemption removal is subject to the "general principal that defendants seeking removal under the doctrine of complete preemption bear a significant burden . . . as we must construe removal strictly, reasonable doubts must be resolved against the complete preemption basis for it." *Lontz v. Tharp*, 413 F.3d 435, 441 (4th Cir. 2005) (quoting *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260 (2005)).

Defendants argue that portions of the Complaint fall within the narrow scope of complete preemption because they are, in effect, challenges to the rate of interest: usury claims.  In *Beneficial National Bank v. Anderson*, the Supreme Court held that sections 85 and 86 of the National Bank

Act, 12 U.S.C. §§ 85-86, completely preempt state-law usury claims against national banks.  539 U.S. at 6.  Section 85, titled "rate of interest on loans, discounts and purchases," provides that "associations" may "take, receive, reserve, and charge on any loan or discount made" an interest rate allowed by the state, territory, or district where located, or an interest rate tied to the district Federal Reserve Bank's 90-day commercial paper interest rate.  12 U.S.C. § 85.  Section 86 provides the penalties for taking interest in excess of the rates specified in § 85.  Sections 85 and 86 preempt claims arising under state usury statutes, and other state law challenges to the rate of interest charged, regardless of whether they are denominated as usury claims.  *See, e.g.*, *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 738 (1996); *Phipps v. FDIC*, 417 F.3d 1006, 1009 (8th Cir. 2005).  To be completely preempted under §§ 85 and 86, a claim must satisfy two basic requirements: 1) the fee or charge challenged must be "interest" within the NBA; and 2) the rate of that interest must be at issue.  *Smiley*, 517 U.S. at 738.

Fees charged for DCC and DSA are not "interest" in its most traditional form.  "Interest" under the NBA, however, is a somewhat broader concept.  *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 739 (1996).  In *Smiley*, the Court held that late fees charged to credit card holders who did not make monthly minimum payments on time were "interest" under the NBA.  *Id*.  This holding confirms that "interest" under the NBA encompasses some variety of credit-related fees.  In *Smiley*, the Court adopted the Comptroller of Currency's regulations defining "interest," under the NBA, deferring to the Comptroller's "reasonable judgment[]" as to the meaning of an ambiguous term in a statute he is charged with administering.  *Id*. at 739 (citing *NationsBank of N.C., N.A., v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-57 (1995), and *Chevron USA. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-45 (1984)).  The Comptroller of Currency ("OCC") regulations

regarding "interest" are thus the relevant guidance on what charges constitute interest under the NBA.  The applicable regulations, found at 12 C.F.R. § 7.40001(a), specify:

> (a) Definition. The term "interest" as used in 12 U.S.C. 85 includes any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended.  It includes, among other things, the following fees connected with credit extension or availability: numerical periodic rates, late fees, creditor-imposed not sufficient funds (NSF) fees charged when a borrower tenders payment on a debt with a check drawn on insufficient funds, overlimit fees, annual fees, cash advance fees, and membership fees.  It does not ordinarily include appraisal fees, premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit, finders' fees, fees for document preparation or notarization, or fees incurred to obtain credit reports.  12 C.F.R. § 7.4001(a).

The parties disagree about whether this definition includes DSA/DCC.  Plaintiff argues that the plans are not payments "compensating a creditor for an extension of credit," but rather a separate charge for a separate service.  Defendants contend that the plans are terms of the credit line, or modifications of the credit line, and as such, are interest.  The Court agrees with the Plaintiff.

Defendants' arguments are appealing at first glance.  By regulation, interest includes "any payment compensating a creditor for an extension of credit," 12 C.F.R. § 7.4001(a), and "contractual arrangement[s] modifying loan terms."    12 C.F.R. §§ 37.1(f)-(g);[3] OCC Final Rule, "Debt

---

[3] The full text of this section is:

> "(f) Debt cancellation contract means a loan term or contractual arrangement modifying loan terms under which a bank agrees to cancel all or part of a customer's obligation to repay an extension of credit from that bank upon the occurrence of a specified event.  The agreement may be separate from or a part of other loan documents.

(continued...)

Cancellation Contracts and Debt Suspension Agreements," 67 Fed. Reg. 58962-01 (Sept. 19, 2002).

Defendants argue that these definitions include DCC/DSA because the plans are essentially payment

for an extension or modification of credit under more favorable terms.  Defs.' Resp., ECF No. 17,

at 4 ("although often referred to as payment protection "plans" or "products," these plans are

actually contractual modifications of credit card loan agreements.  Customers who enroll in such

plans agree to pay a fee—calculated as a percentage of the balance on their credit card account—in

exchange for the right to cancel or suspend payment of their [debt under certain circumstances].").

Next, Defendants contend that the structure of the plans makes them interest.  Cardholders

pay for the plans through a monthly fee, assessed as a percentage of the balance of the enrolled

credit account.  *See* Complaint, ECF No. 1, Ex. 1, at ¶ 58.  Defendants argue that each plan is

therefore a "numerical periodic rate" "connected with credit extension or availability."  *See* 12

C.F.R. § 7.40001(a); 12 C.F.R. § 37.2.  Defendants also analogize to the various financial charges

that are "interest" within the NBA: late fees, *Smiley*, 517 U.S. at 744-45, mortgage origination fees,

*Phipps v. FDIC*, 417 F.3d 1006, 1012 (8th Cir. 2005), account opening fees, prepayment fees, early

account closure fees, rejected transaction fees, and fees for exercising fixed-interest-rate options

(OCC Interp. Ltr. 803, 1998 WL 320183 (Mar. 1998)).

---

[3](...continued)

      (g) Debt suspension agreement means a loan term or contractual arrangement modifying loan terms under which a bank agrees to suspend all or part of a customer's obligation to repay an extension of credit from that bank upon the occurrence of a specified event.  The agreement may be separate from or a part of other loan documents.  The term debt suspension agreement does not include loan payment deferral arrangements in which the triggering event is the borrower's unilateral election to defer repayment, or the bank's unilateral decision to allow a deferral of repayment."

-10-

Despite some superficial similarities between the plans and other products deemed "interest," Defendants' arguments fail.  True, the plans are certainly "connected with" the extension of credit: they are charged directly to the enrolled credit account.  *See* Complaint at ¶ 19; 12 C.F.R. § 37.1(c).  However, as Plaintiff contends, this connection is insufficient to render the plans "interest."

First, the relevant regulations provide that interest is "payment compensating a creditor for an extension of credit," 12 C.F.R. § 7.40001(1), but DCC/DSA fees are not compensation for "extending" a line of credit.  Many consumers holding credit cards offered by Defendants do not participate in the plans, and if they do, may stop participating in the plans without losing their credit accounts.  *See* Complaint, ECF No. 1, Ex. 1, ¶¶ 60-62.  Second, although Defendants characterize the plans as payment for a modification to the extended credit line—and, therefore, interest—the plans are no more than very limited modifications of the underlying credit terms.  Although 12 C.F.R. §§ 37.2(f)-(g) defines DCC/DSA in relevant part as "contractual arrangement[s] modifying loan terms," this definition is in tension with the substance of the regulation, which provides that a national bank may not "alter the terms or conditions of an extension of credit based on the customer entering into a debt cancellation contract or debt suspension agreement with the bank."  12 C.F.R. § 37.3(a).  Therefore, even if the plans are nominally modifications of the underlying account, such a characterization does not end the inquiry into whether they are "interest."

Further inquiry confirms that DCC/DSA fees are not interest, because they are charges specifically assigned to cover a particular service, not general charges for the extension of credit.  The Supreme Court and the OCC have recognized that where a fee is "specifically assigned" to cover a particular service, not part of the basic package of credit card fees, that fee is not interest.  *Smiley,* 517 U.S. at 741-42.  DCC/DSA fees are so "specifically assigned."  DCC/DSA are charged

-11-

to the attached credit account monthly, but charged separately from standard account maintenance charges. As has been noted, the enrolled credit line cannot be extended or modified based on a customer's participation in a DCC/DSA. When a cardholder uses benefits under a DCC/DSA, minimum payments are suspended, but the credit line may remain otherwise unchanged—the DCC/DSA fee, and any other account or interest charges, accrue independent of any payment suspension. Complaint, ECF No. 1, Ex. 1, at ¶ 47.

The distinction between such a specifically-assigned service fee (which is not interest) and general account fees (which are interest) has been recognized by the Supreme Court, which stated, "to be sure, in the broadest sense *all* payments connected in any way with the loan—including reimbursement of the lender's costs in processing the application, insuring the loan, and appraising the collateral—can be regarded as 'compensating [the] creditor for [the] extension of credit.' But it seems to us quite possible and rational to distinguish, as the [OCC] regulation does, between those charges that are *specifically assigned* to such expenses and those that are assessed for simply making the loan, or for the borrower's default." *Smiley*, 517 U.S. at 741-42. The OCC has likewise acknowledged "a line between charges that fit within the definition of interest and 'all other payments.'" *See* OCC Inter. Ltr. 803, 1998 WL 320183 *2 (Oct. 7, 1998); *Phipps*, 417 F.3d at 1012.

The relevant regulation, 12 C.F.R. § 7.4001(a), details these categories. The regulation identifies charges customary to and inherent in making the original extension of credit: interest rates, account opening fees, late fees, annual fees, and others. *Id*. These fees are interest. In contrast, various fees, some of which may even be charges necessary to opening a line of credit, are not interest: appraisal and documentation fees, among others. *Id*. If fees which may be necessary to the extension of credit are not interest, then DCC/DSA, which are admittedly and statutorily optional,

are also not interest.  DCC/DSA are instead financial products, paid for by a "specifically assigned" charge, which create an option for the borrower to suspend or cancel payments in some circumstances.  They are not, therefore, within the regulation's category of fees which are "interest."

Plaintiff, in passing, analogizes DCC/DSA plans to "premiums and commissions attributable to insurance guaranteeing repayment of an extension of credit," fees specifically identified as "not interest" in § 7.4001(a).  Defendants correctly point out that West Virginia has determined that DCC/DSA are not regulated as "insurance" by the state because the plans do not "require the lender to reimburse or make a payment to the borrower as a result of the occurrence of a specific event." *See* OIC W. Va. Info. Ltr 171 (Sept. 2009).  However, this does little to advance Defendants' position, because whether DCC/DSA are regulated as insurance in West Virginia has no bearing on Plaintiff's argument that they are *like* insurance for the purpose of a § 7.4001(a) analysis.  The plans are like insurance, in that they offer some added protection against default, and also like the other fees listed as "not interest" under § 7.4001(a), which are "specifically assigned" to cover services other than loan extension and maintenance.  *See* OCC Inter. Ltr. 803, 1998 WL 320183 at *2.

Finally, Defendants' method of assessing the DCC/DSA fee as a percentage of the monthly balance of the enrolled account does not alter this assessment.  The method of calculating a charge is not determinative of whether it is interest.  *Smiley*, noting that "any flat charge may, of course, readily be converted to a percentage charge," rejected the contention that a fee must be structured as a rate to be interest.  517 U.S. at 745-46.  The corollary of this proposition must be that structuring a fee as a rate does not automatically transform it into interest.  For these reasons, the Court determines that DCC/DSA are not interest under the NBA, and, therefore, that complete preemption does not bring this case within federal jurisdiction.

-13-

The Court next notes that even if the plans are "interest" under the NBA, the Complaint must also allege that the "interest" is excessive—usurious—to invoke complete preemption. *Beneficial*, 539 U.S. at 10-11.  Plaintiff argues that even if the plans are "interest," the Complaint is not focused on the amount of that interest charged to consumers.  Rather, the Complaint alleges that "the service plan charges should not be on the bills at all—not at a lower rate, not at any rate."  Pl.'s Reply, ECF No. 19, at 2.  The Court agrees with this characterization of the claims.

Although the Court has determined that DCC/DSA are not interest, it is certainly possible that a complaint may involve a product that is "interest" under the NBA, yet not allege that the interest is excessive.  For example, in *West Virginia ex rel. McGraw v. Capital One Bank*, 2010 WL 2901801 (S.D.W. Va. Jul. 22, 2010), this Court considered whether the Attorney General's WVCCPA claim that the defendant card issuer engaged in practices designed to make cardholders exceed credit limits, and thus incur excess over-the-limit fees, was a claim involving "interest" under the NBA.  Although such over-the-limit fees may be "interest" under the NBA, in *Capital One*, the Court determined that the plaintiff's complaint challenged the practices inducing the fees—not the type, rate, or amount of the fees—and so the complaint was not completely preempted. *Capital One*, 2010 WL 2901801 at *6-7 (citing *Young v. Wells Fargo & Co*., 671 F. Supp. 2d 1006, 1021 (S.D. Iowa 2009) ("the basis of the alleged excessiveness [in fees] is that Wells Fargo charged fees when they should not, a wholly different claim from a claim that Wells Fargo applied an illegal interest rate.  As such, Plaintiffs' claims are not usury claims and are not subject to complete preemption by § 86 of the NBA."); *Saxton v. Capital One Bank*, 392 F. Supp. 2d 772, 783 (S.D. Miss. 2005) ("With regard to 'interest,' plaintiffs do not challenge the legality of the rate of interest charged by defendants.  Rather, they claim that various interest fees were not disclosed, were unwarranted, were

-14-

based on charges that were themselves improper, and in sum should never have been charged at all.")).

Defendants argue that the Complaint does allege an illegal rate of interest, and is thus completely preempted by §§ 85-86.  Defendants assert that "[n]umerous allegations in the Complaints assert [a] disparity between price and value" of the plans. Defs.' Resp., ECF No. 17, at 7.  This line of argument, advanced at pages 10-13 of Defendants' Response, is superficially attractive, but ultimately overbroad.  It is possible that a complaint alleging excess fees may constitute a claim about usurious interest, *see* Defs.' Resp. at 17 (collecting cases).  However, every allegation that an interest charge is improper need not be an allegation that it is usurious; such a rule would consume *any* state fraud action involving an "interest" product.  Further, as Defendants themselves point out, under West Virginia law, courts *must* consider whether there is a gross disparity between price and value when examining whether a contract is unconscionable.  *See id.* at 13; W. Va. Code § 46A-7-109(3)(c).  This disparity, however, is just one of the factors a court must consider when evaluating a consumer protection action under West Virginia law, *see* W. Va. Code §§ 46A-7-109(3)(a)-(c), and surely this required inquiry does not transform every consumer action involving an interest product into an usury action.  Last, the fact that the Complaint mentions "excess" charges does not create a usury claim because "excess" fees under the WVCCPA are simply fees collected in violation of the statute.

Taken together, Plaintiff's claims do challenge the value of the plans to consumers, but in doing so plainly allege that the plans simply have no value to many consumers—not that they are usurious.  Similarly, the claims do allege that Defendants profited from their sale of the plans, yet such an allegation would appear to be a necessary element of any action for disgorgement of excess

charges under W. Va. Code. § 46A-7-111, rather than an independent claim for usury.  Most tellingly, nothing in the Complaint indicates that Defendants' allegedly illegal activities in selling and administering the plans would be acceptable were the plans priced differently.  Reviewing the Complaint, and particularly the portions which the parties believe are relevant to this question,[4] it appears that the Complaint is not directed at the amount of interest, and is not, therefore, completely preempted by the NBA.

The above complete preemption analysis applies to all eight Defendants, even though not all are  national banks.  Four of the Defendants are nationally-chartered banks, and removal of any usury claim against them is governed by the complete preemption analysis pertaining to NBA sections 85 and 86.  The other Defendants, three state-chartered banks and one federal savings association, are not directly governed by §§ 85-86, yet the same preemption analysis applies.[5]

The three state-chartered banks in this case are governed in relevant part by Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDA), 12 U.S.C. § 1831d.  The preemptive language of Section 1831d is "virtually identi[cal]," to Sections 85 and 86 of the NBA, and its preemptive scope is likewise identical.  *Discover Bank v. Vaden*, 489 F.3d 594,

---

[4] *See* Pl.'s Reply, ECF No. 19; Defs.' Notice of Removal, ECF No. 1, at 6.

[5] The Dodd-Frank act changed the scope of preemption in many areas of consumer financial protection, but specifically left intact the body of law relating to preemption under 12 U.S.C. § 85, and the definition of "interest."  *See* 12 U.S.C. § 25b(f):

(f) Preservation of powers related to charging interest:

No provision of title 62 of the Revised States shall be construed as altering or otherwise affecting the authority conferred by section 85 of this title for the charging of interest by a national bank at the rate allowed by the laws of the State, territory, or district where the bank is located, including with respect to the meaning of "interest" under such provision.

606 (4th Cir. 2007), *rev'd on other grounds*, 556 U.S. 49 (2009); *see also In re Cmty. Bank of N. Va.*, 418 F.3d 277, 295-96 (3d Cir. 2005); *Greenwood Trust Co. v. Commw. of Mass.*, 971 F.2d 818 (1st Cir. 1992); *Saxton v. Capital One Bank*, 392 F. Supp. 2d 772, 781 (S.D. Miss. 2005).  Thus, to the extent the NBA completely preempts the state law claims in this case, the DIDA does the same, so the complete preemption analysis will be identical for both the state-chartered and nationally-chartered banks.

The preemption standard for usury claims against the federal savings association Defendant (GE Money Bank, 3:11-689) is also determined by reference to the complete preemption standard applicable to §§ 85-86.  The Dodd-Frank Act specifically aligned these two standards in 12 U.S.C. § 1465(a), which provides that "any determination by a court . . . regarding the relation of State law to a provision of [the savings associations] chapter or any regulation or order prescribed under this chapter shall be made in accordance with the laws and legal standards applicable to national banks regarding the preemption of state law."  In sum, the complete preemption analysis for the national banks will govern the complete preemption analysis for the other defendants in this case. Consequently, the Complaint is not completely preempted as to any of the Defendants.

### III.  The Class Action Fairness Act

Defendants next argue in support of removal that the Complaint presents a class or mass action which may be removed under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). This argument is foreclosed by the Fourth Circuit's recent decision in *West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, which held that consumer protection actions brought by the Attorney

General under the WVCCPA are *parens patriae* actions, not class actions.  646 F.3d 169 (4th Cir.

2011) *cert. denied*, No. 11-224, 2011 U.S. LEXIS 8531 (Nov. 28, 2011).

CAFA provides for federal jurisdiction over certain class actions.  Pursuant to CAFA,

removal is proper if there is minimal diversity of citizenship, a class action of 100 or more members,

and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and

costs.  28 U.S.C. § 1332(d).[6]  Under CAFA, the term "class action" includes "mass actions," actions

not formally designated as class actions, but in "which monetary relief claims of 100 or more

persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common

questions of law or fact."  1332(d)(d)(11)(A)-(B).[7]

---

[6] The relevant portions of 28 U.S.C. § 1332 provide:

(d)(1) In this subsection--
    (A) the term "class" means all of the class members in a class action;

    (B) the term "class action" means any civil action filed under rule 23 of the Federal
    Rules of Civil Procedure or similar State statute or rule of judicial procedure
    authorizing an action to be brought by 1 or more representative persons as a class
    action; . . .

(d)(2) The district courts shall have original jurisdiction of any civil action in which the
matter in controversy exceeds the sum or value of $ 5,000,000, exclusive of interest and
costs, and is a class action in which . . .
    (A) any member of a class of plaintiffs is a citizen of a State different from any
    defendant . . .

[7] The relevant portions of 28 U.S.C. § 1332 provide:

(d)(11)(A) . . .  a mass action shall be deemed to be a class action removable under
paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs. . .

    (B) (i) As used in subparagraph (A), the term "mass action" means any civil action
    [ . . . ] in which monetary relief claims of 100 or more persons are proposed to be
    tried jointly on the ground that the plaintiffs' claims involve common questions of
    (continued...)

The WVCCPA is a set of West Virginia consumer protection laws defining and prohibiting certain unfair trade and business practices. The WVCCPA specifically authorizes the West Virginia Attorney General to seek both injunctive and monetary relief for violations of the Act. *See, e.g.*, W. Va. Code §§ 46A-7-(109)-(111). Under these provisions, the Attorney General is "authorized to file suit independently of any consumer complaints, as a *parens patriae*, that is, as the legal representative of the State to vindicate the State's sovereign and quasi-sovereign interests, as well as the individual interests of the State's citizens." *CVS Pharmacy*, 646 F.3d at 176.

Defendants contend that this case is a class or mass action under CAFA. They reason that the Complaint is best viewed as representing the interests of the individual West Virginia cardholders affected by the DCC/DSA plans at issue, rather than the Attorney General's interest as *parens patriae*, because the Attorney General is seeking, in part, recovery for cardholders harmed by Defendants' practices. *See* Defs.' Resp., ECF No. 17, at 31-32 (noting that the Complaint seeks refund of excess charges under W. Va. Code § 46A-7-111(1), including recovery for "all West Virginians injured by Defendants' acts"); Complaint, ECF. No. 1, Ex. 1, at 21. Under this reasoning, West Virginia citizens are, therefore, the "real parties in interest" in this suit, the suit

---

[7](...continued)
> law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).
>
> (ii) As used in subparagraph (A), the term "mass action" shall not include any civil action in which . . .
>> (III) all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action . . .

involves the claims of "more than 100 persons," and federal jurisdiction under CAFA is appropriate.[8]

Defendants' removal argument cannot succeed under the Fourth Circuit's recent *CVS Pharmacy* decision.  In *CVS Pharmacy*, the West Virginia Attorney General brought suit in West Virginia state court alleging that various pharmacies were violating the WVCCPA, W. Va. Code §§ 46A-6-104, 46A-7-111 *et seq*., and West Virginia's generic drug pricing statute, W. Va. Code § 30-5-12b(g).  646 F.3d at 171-72.  The Attorney General sought injunctive relief, restitution and disgorgement of overcharges, recovery on behalf of consumers of excess charges, civil penalties, interest, costs, and fees.  *Id*. at 172.  The defendant pharmacies removed, arguing that the action was a "disguised class action," and therefore subject to federal jurisdiction under CAFA.  The district court granted the plaintiff's motion to remand, noting that the action was a "classic *parens patriae* action that is neither a class action nor a mass action contemplated by CAFA."  *Id*. at 173 (quoting *West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 748 F. Supp. 2d 580, 596 (S.D.W. Va. 2010) (Copenhaver, J.)).  The defendants sought and received permission to appeal.

On appeal, the Fourth Circuit relied principally on the fact that a "class action" must be filed under Fed. R. Civ. P. 23 or a "similar state statute or rule of judicial procedure" to determine that WVCCPA actions are not class actions.  *Id*. at 174-75.  The court decided that the West Virginia statutes authorizing the Attorney General to bring the suit, among them W. Va. Code. §§ 46-A-7-111(1)-(2) and § 46A-6-101, "contain virtually none of the essential requirements" for a class action.

---

[8] The parties offered argument on the other requirements of proceeding as a CAFA mass or class action, such as the amount in controversy requirement.  However, as the Court determines that the Attorney General is the real party in interest in this matter, there are not multiple plaintiffs in this case.  As the numerosity requirement of a class or mass action is not met, the Court need not consider the other requirements for proceeding as a class or mass action.

*Id.* at 175.  The instant WVCCPA action, authorized by these same statutes, is similarly deficient, and not a class action.

Defendants next contend that the action is removable as a CAFA "mass action."  28 U.S.C. § 1332(d)(11)(B)(i).  This question was neither raised nor decided in *CVS Pharmacy*, but its holding nonetheless precludes removal of this action as a mass action.

Whether a WVCCPA action may be a "mass action" under CAFA was not directly addressed in *CVS Pharmacy* because it was not raised by those parties on appeal.  *See* Br. of Defs.–Appellees, No. 10:267, ECF No. 40, at 3-4 (Dec. 28, 2010) (stating that issue presented for decision is whether the WVCCPA action is a class action under CAFA); Br. of Pl.–Respondent, No. 10:267, ECF No. 45, at 5 n. 2 (Jan. 18, 2011) ("Defendants do not assert, have never asserted, and indeed could not assert this case is a CAFA 'mass action' under 28 U.S.C. § 1332(d)(11).").  Although *CVS Pharmacy* affirmed the district court's remand order, which did hold that the action was a "classic *parens patriae* action that is neither a class action *nor a mass action* contemplated by CAFA," *CVS Pharmacy* did not explicitly address whether a WVCCPA action could be a mass action under CAFA.  *West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 748 F. Supp. 2d at 596. (emphasis added).

Defendants argue that *CVS Pharmacy* cannot be extended to preclude removal of WVCCPA actions as "mass actions" under CAFA, because the *CVS Pharmacy* opinion focused on the specific differences between WVCCPA actions and "class actions"under Fed. R. Civ. P. 23 and analogous state statutes.  *CVS Pharmacy* did make extensive comparisons between WVCCPA and Rule 23-type actions.  *See id*. at 174; 28 U.S.C. § 1332(d)(1)(B).  However, in making that comparison, the court determined that when the Attorney General brings a WVCCPA action, he does not act as one

representative of a larger class of plaintiffs, but rather as a trustee or a regulator. *Id*. at 175-76. As such, he acts in his capacity as *parens patriae*, "that is, as the legal representative of the State to vindicate the State's sovereign and quasi-sovereign interests, as well as the individual interests of the State's citizens." *CVS Pharmacy*, 646 F.3d at 176.

This observation is critical because in determining whether an action is a mass action, the Court must identify the real party in interest to the complaint. If the individual consumers are the real parties in interest, the action presents the claims of numerous plaintiffs, and the claim should not avoid removal as a mass action simply because the Attorney General is the named plaintiff. However, if the Attorney General is the real party in interest, pursuing his interests as *parens patriae*, there is only one plaintiff, and the action is not a mass action.

Defendants rely on the Fifth Circuit's decision in *Louisiana ex rel Caldwell v. Allstate Insurance Co.*, 536 F.3d 418 (5th Cir. 2010) as support for the argument that the individuals benefitting from the Attorney General's suit, not the Attorney General, are the real parties in interest in this matter. In *Caldwell*, the Louisiana Attorney General sued various insurance companies, alleging that they had colluded to minimize payouts to policyholders. *Id*. at 422. The Attorney General sought injunctive relief, and treble damages payable to affected policyholders. *Id*. at 429. The Fifth Circuit held that the policyholders were the real parties in interest to the suit, because the Attorney General sought some relief that would inure to them alone. *Id*. at 430. Therefore, the case involved the "monetary relief claims of 100 or more persons" and could be removed as a mass action under CAFA. *Id*. Defendants argue that the same result is appropriate in this case.

The Court disagrees. *Caldwell* relied on a claim-by-claim approach, in which the court dissected the action to determine that some relief would benefit individuals rather than the State,

rendering them, and not the Attorney General, the real parties in interest. *Id*. at 429-30. As the Seventh Circuit pointed out in a decision following and approving of *CVS Pharmacy*, this kind of claim-by-claim analysis is widely disfavored. *LG Display Co. v. Madigan*, No. 11-8017, 2011 U.S. App. LEXIS 23036 at * 12-13 (7th Cir. Nov. 18, 2011). *LG Display*, rejecting *Caldwell*, explained that "claim-by-claim analysis has been questioned by a number of courts" and that the appropriate inquiry in determining the real party in interest is to examine the whole complaint, and decide the real party in interest based on the "essential nature and effect of the proceeding." *Id*. at *11-13 (citing *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 458, 464 (1945)). Numerous other courts have adopted this position. *See, e.g.*, *id*. at *13-14 (collecting cases); *South Carolina v. AU Optronics Corp.*, No. 3:11-cv-00731-JFA, 2011 WL 4344079 at *6 (D.S.C. Sept. 14, 2011) (collecting cases); *Dep't of Fair Empl. & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 739-40 (9th Cir. 2011) ("the question as to whether or not the state is the real party in interest must be determined by the essential nature and effect of the proceeding [].") (quoting *Geeslin v. Merriman*, 527 F.2d 452, 455 (6th Cir. 1975)).[9]

---

[9] Defendants mistakenly rely on *Lucent* for the proposition that individuals rather than states are the real parties in interest in some *parens patriae* actions. Defs.' Resp., ECF No. 17, at 33, citing *Lucent*, 642 F.3d at 739-40. *Lucent* was an action brought by California's employment agency on behalf of one former employee of Lucent Technologies, seeking remedies for that one former employee and some systemic changes at that one company. *Lucent*, 642 F.3d at 739. The court found that California was not a real party in interest to the action. *Id*.

   In deciding that the individual former employee rather than the state was the real party in interest, the court determined that any benefits inuring to the State, such as anti-discrimination training of a corporation's employees, were "tangential" to the substantial benefits sought for the one former employee– back pay, interest, damages for suffering, and punitive damages. *Id*. at 740, n. 8. The present case, which alleges damage to more than one individual, and which seeks a number of substantial types of relief which will inure to the State, can be distinguished on these facts. Further, as noted above, *Lucent* adopts the "whole claim" approach to the real party in interest analysis, not the claim-by-claim analysis Defendants urge this Court to adopt under *Caldwell*. In
(continued...)

Turning to the "essential nature and effect" of this proceeding, it is clear that the Attorney General is the real party in interest. The Attorney General seeks injunctive and monetary penalties, and only some of those penalties would be payable to individual cardholders harmed by Defendants' allegedly deceptive and unfair practices. These refunds do not dominate the action. Rather, as the Fourth Circuit recognized in *CVS Pharmacy*, this type of WVCCPA action is a *parens patriae* action. *Id*. at 176-77 (citing *In re Edmond*, 934 F.2d 1304, 1310 (4th Cir. 1991)).

The power to sue as *parens patriae*—literally, parent of the country—is "inherent in the supreme power of every State." *Mormon Church v. United States*, 136 U.S. 1, 57 (1890). In order to bring a *parens patriae* action, "the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party." *Alfred L. Snapp & Son, Co. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 606 (1982). As *parens patriae*, the State may assert "quasi-sovereign interests," which "are not sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party. They consist of a set of interests that the State has in the well-being of its populace." *Id*. at 602. A state may have a quasi-sovereign interest in "bringing an action to enforce its laws, disgorge the proceeds of ill-gotten gains, and refund them to its citizens." *AU Optronics*, 2011 WL 4344079 at*6 (quoting *In re Edmond*, 934 F.2d at1312). As recognized by *CVS Pharmacy*, an Attorney General WVCCPA action is brought by the State as *parens patriae*. The State's quasi-sovereign interests, not those of the individual cardholders, dominate the Complaint, and it is not a mass action.

---

[9](...continued)
all, *Lucent* does not support Defendants' position.

-24-

In determining that the Attorney General's consumer protection suit is neither a class nor mass action, the Court follows not only *CVS Pharmacy*, but also Seventh and Ninth Circuit decisions issued since *CVS Pharmacy*. *See LG Display Co. v. Madigan*, 2011 U.S. App. LEXIS 23036; *Washington v. Chimei Innolux Corp.*, 659 F.3d 843 (9th Cir. Oct. 3, 2011). The *Caldwell* court's characterization of an attorney general action as a mass action rather than as a *parens patriae* suit in which the state is the real party in interest is a minority approach, and the Court declines Defendants' invitation to adopt it. This action may not be removed as a mass action under CAFA.

## IV. Substantial Federal Question

The national bank and federal savings association defendants[10] offer a third basis for removal: that the Complaint presents a substantial federal question, and is therefore subject to federal jurisdiction. NOR, ECF No. 1, at 7-9. This removal argument does not succeed.

In general, the well-pleaded complaint rule forbids removal absent a federal question in the complaint itself. In the "vast majority" of cases, a "suit arises under the law that creates the cause of action." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 8-9 (quoting *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916)). However, an exception arises where a "the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Franchise Tax Bd.*, 463 U.S. at 9 (citing *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180 (1921)). This exception is not widely available, but rather only allows

---

[10] These defendants are: JP Morgan Chase & Co. and Chase Bank USA, N.A., 3:11-683, a nationally-chartered banking association; GE Money Bank, 3:11-689, a federally-chartered savings association; Bank of America Corp. and FIA Card Services, N.A., 3:11-693, a nationally-chartered banking association; Citigroup, Inc., and Citibank, N.A., 3:11-695, a nationally-chartered banking association; and HSBC Bank Nev., 3:11-717, a nationally-chartered banking association.

removal[11] when a state law claim "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc., v. Darue Eng. & Mfg.*, 545 U.S. 308, 314 (2005). Such a claim is said to "arise under" federal law. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

One year after setting forth the standard for substantial federal question jurisdiction in *Grable*, the Supreme Court explained that the category of cases subject to *Grable* jurisdiction is "special and small." *Empire Healthchoice Assur., Inc., v. McVeigh*, 547 U.S. 677, 699 (2006). In *Empire Healthchoice*, the Supreme Court listed the features of *Grable* which made jurisdiction appropriate: the case presented "nearly a pure issue of law," and the federal law involved—an IRS provision—was "an essential element of [the] claim; indeed, it appeared to be the only issue contested in the case." *Id*. at 700. Additionally, *Grable* presented the opportunity to decide an issue "once and for all," which would thereafter govern numerous similar cases. *Id*. *Empire Healthchoice* concluded that "it takes more than a federal element to open the 'arising under' door." *Id*. at 701 (quoting *Grable*, 545 U.S. at 313). *See generally* 13D Wright & Miller, Fed. Prac. & Proc. § 3562. Thus, substantial federal question jurisdiction is present only in a "small class of cases where, even though the cause of action is not created by federal law, the case's resolution depends on resolution of a federal question sufficiently substantial to arise under federal law within the meaning of 28 U.S.C. § 1331." *Ormet Corp. v. Ohio Power Co.*, 83 F.3d 799, 806 (4th Cir. 1996); *see also Morgan*

---

[11] The substantial federal question rule applies to both original and removal jurisdiction. *Franchise Tax Bd.*, 463 U.S. at 11, n. 9.

*Cnty War Mem. Hosp. v. Baker*, 314 Fed. Appx. 529, 2008 WL 4949141 at *3 (4th Cir. 2008) (unpublished) (following *Ormet* in a post-*Grable* case).

Defendants argue that the *Grable* exception to the well-pleaded complaint rule applies in this case for two reasons.  "First, the Complaints allege federal disclosure violations that exist solely under federal law."  Defs.' Resp., ECF No. 17, at 22.  "Second, the Complaints allege that the defendants violated the WVCCPA by violating [federal statutes]."  *Id*.  Specifically, Defendants argues that the *Grable* exception applies because Paragraph 73 of the Complaint asserts that Defendants committed "violations of statutes enacted to protect the consuming public or in the exercise of the State's police power constitute unfair or deceptive acts or practices."  Defendants reason that the "statutes enacted to protect the consuming public" necessarily include the National Bank Act and its implementing regulations, particularly the OCC regulations governing DCC and DSA, 12 C.F.R. §§ 37.1-37.8.  NOR, ECF No. 1, at 8, ¶ 23.

An action removed under the substantial federal question doctrine must raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.  *Grable*, 545 U.S. at 314.  Under this analysis, the Complaint does not present a substantial federal question and there is no federal jurisdiction.

First, Defendants argue that "the Attorney General has created a substantial federal question under *Grable* because his affirmative claims for relief allege that the Defendants have violated consumer protection standards that can *only* be federal standards."  Defs.' Resp., ECF No. 17, at 26.  In support of this contention, Defendants correctly note that there are federal standards for

DCC/DSA issued by national banks,[12] and that the regulations setting forth these standards broadly preempt any state cause of action relating to DCC and DSA. *See, e.g.*, 12 C.F.R. § 37.1(c) (expressly preempting state law).[13]   However, these federal standards have little bearing on the present motion: excepting "complete preemption," preemption is not a basis for federal jurisdiction. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987).  And, although Defendants are correct that preemption means that resolving the claims in the Complaint will require application of a federal regulation, application of a federal regulation does not necessarily result in a substantial federal question.  *See Bennett v. Bank of Am. N.A.*, 3:11-cv-003, 2011 U.S. Dist. LEXIS 51152 at *4-5 (E.D. Va. May 10, 2011) (allegation that defendant breached contract by violating federal guidelines insufficient to raise substantial federal question); *cf. Merrell Dow Pharmaceuticals v. Thompson,* 478 U.S. 804, 817 (1986) (complaint alleging violation of a federal statute as an element of a state cause of action does not arise under federal law).  This is true even when the regulation lies in an area of extensive federal involvement.  *See, e.g.*, *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 521, 338 (5th Cir. 2008) (finding a railroad's "attempts to establish federal jurisdiction on the basis of the general federal interest in interstate railroad transportation" insufficient under *Grable.*).

Second, Defendants argue that the Complaint alleges violations of laws which "can only be" federal laws, thus creating a substantial federal question.  This argument has no merit.  Although the heart of the action does revolve around Defendants' issuance and administration of DCC/DSA,

---

[12]   And by extension, the federal savings association.   12 U.S.C. § 1465(a) ("any determination by a court . . . regarding the relation of State law to a provision of this chapter or any regulation or order prescribed under this chapter shall be made in accordance with the laws and legal standards applicable to national banks regarding the preemption of state law.").

[13] Federal regulations have no less preemptive effect that federal statutes.  *Fid. Fed. Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

which are federally regulated, the Complaint alleges violation of West Virginia consumer protection laws—not noncompliance with federal regulations.  To the extent that some federal questions will need to be resolved in any trial on the merits, they are components of the state-law allegations, rather than the heart of the action.  *See* 13D Wright & Miller, Fed. Prac. & Proc. § 3562 ("Obviously, not every state-law claim raising a federal issue can invoke federal question jurisdiction.  Indeed, such cases will be exceptional.").  Courts have regularly found that cases implicating federal issues in areas of extensive federal regulation are still not subject to *Grable* jurisdiction.  *See, e.g.*, *Morgan Cnty. War Mem. Hosp. v. Baker*, 2008 WL 4949141 at *3 (no substantial federal question jurisdiction in case implicating ERISA and the federal tax code); *Barrois*, 533 F.3d at 338 (no substantial federal question jurisdiction in case implicating interstate railroad transportation); *Milkulski v. Centerior Energy Corp.*, 501 F.3d 555 (6th Cir. 2007) (en banc) (no substantial federal question jurisdiction in case implicating the federal tax code).  *Cf. Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010) (substantial federal question jurisdiction in case involving an Office of Thrift Supervision regulation which presented "nearly a pure issue of federal law, and none of the other relevant factors weigh[ed] against federal jurisdiction.").  As the D.C. Circuit noted in *Bender v. Jordan*, *Grable* jurisdiction is "disfavored for cases which are 'fact-bound and situation-specific,' *or which involve substantial questions of state as well as federal law*."  623 F.3d at 1130 (emphasis added).  The action at issue here is not "a creature of federal law," *id.*, but rather an action for violations of a state law.  Defendants point to no indication that federal issues are the "only" issues in this case, nor do they argue that federal jurisdiction in this matter will offer an opportunity to decide a question of law "once and for all."  *See Empire Healthchoice*, 547 U.S. at 699.  In short, they do not identify the kind of substantial federal question that gives rise to *Grable* jurisdiction.

This outcome is dictated by both the case law and the principle that *Grable* jurisdiction applies only in a "special and small" set of circumstances. *Empire Healthchoice*, 547 U.S. at 699. If the Court accepts Defendants' argument that *Grable* jurisdiction can be found simply because the Complaint will require some application of a federal law, in an area where there is substantial federal regulation, the category of eligible cases will be no longer special nor small. Defendants' extensive arguments about field, conflict, and express preemption exemplify a related problem. If the fact that an area of federal law may preempt state law through field, conflict, or express preemption is sufficient to raise a substantial federal question under *Grable*, the rule that only *complete* preemption is a basis for removal would collapse into *Grable*. Such a result would undermine the well-pleaded complaint rule in many areas of law where there is extensive federal involvement.

Having identified no basis for federal jurisdiction in the first *Grable* factors, the Court turns to the last part of the *Grable* inquiry: whether the assumption of federal jurisdiction would disturb "any congressionally approved balance of federal and state judicial responsibilities." 514 U.S. at 314. The Court concludes that it would.

Federal courts do have an interest in hearing DCC/DSA claims. As Defendants repeatedly emphasize, national banking is, and has long been, an area of intensive federal regulation. *Cf. McCulloch v. Maryland*, 1 U.S. 316 (1819). OCC regulations expressly preempting state laws regarding DSA and DCC, 12 C.F.R. § 37(c), demonstrate that the significant federal interest in national banking extends to these particular financial products.

On the other hand, however, the State's interest in hearing claims based on its own laws in its own courts weighs heavily in favor of retained state jurisdiction. *CVS Pharmacy* reiterated that federal courts must step carefully before "snatch[ing] cases which a State has brought from the

courts of that State, unless some clear rule demands it." 646 F.3d at 179 (quoting *Franchise Tax Bd.*, 463 U.S. at 22). This "clear rule" statement echoes *Barbour v. Intl'l Union*'s caution that " the removal of cases from state to federal court raises significant federalism concerns." 640 F.3d 599, 605 (4th Cir. 2011) (en banc). Because *CVS Pharmacy* concerned exactly the type of action in this case—a West Virginia consumer protection action—its cautionary language regarding the involuntary removal of state litigants to federal court is especially applicable. Given these considerations, this factor of the *Grable* analysis leans against removal jurisdiction.

Viewed as whole, the Complaint does not state the kind of substantial federal question that makes removal under *Grable* appropriate. DCC and DSA are federally-regulated products, and preemption may require the application of federal law in this action. However, state consumer protection actions are not "creatures of federal law," and the State has a significant interest, recognized in *CVS Pharmacy*, in retaining jurisdiction over this type of action. Therefore, the Complaint does not fit into the "special and small" category of cases exemplified by *Grable*, and there is no federal jurisdiction.


## VI. Conclusion

None of the three stated grounds for removal are sufficient to create federal jurisdiction over this action. Plaintiff's Motion to Remand and for Costs and Fees (ECF No. 14) is therefore **GRANTED** as to remand, and all eight cases are **REMANDED** to the Circuit Court for Mason County, West Virginia. Plaintiff's Motion for Remand also requested the award of cost and fees. Although Defendants' arguments for removal jurisdiction ultimately fail, they are not objectively unreasonable, and the Court will not award fees and costs under 28 U.S.C. §1447(c). *See Martin*

-31-

*v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005) ("Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal.").  Plaintiff's Motion (ECF No. 14) is therefore **DENIED** as to costs and fees.  The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.


ENTER:        February 10, 2012


ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE